**[Cite as *State v. Brantley*, 2021-Ohio-4621.]**

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

| | |
|---|---|
| STATE OF OHIO | C.A. No. 29924 |
| Appellee | |
| v. | APPEAL FROM JUDGMENT ENTERED IN THE |
| DERRICK A. BRANTLEY | COURT OF COMMON PLEAS COUNTY OF SUMMIT, OHIO |
| Appellant | CASE No. CR-2013-05-1404-B |

DECISION AND JOURNAL ENTRY

Dated: December 30, 2021

CARR, Presiding Judge.

{¶1} Appellant, Derrick Brantley, appeals the judgment of the Summit County Court of Common Pleas. This Court affirms.

I.

{¶2} This appeal stems from the trial court's denial of Brantley's petition for post-conviction relief after he was convicted of four counts of aggravated murder. In 2013, Ronald Roberts, Kiana Welch, Kem Delaney, and Maria Nash were shot and killed in the basement of an apartment located at 42 Kimlyn Circle in Akron. Brantley and his co-defendant Deshanon Haywood were indicted on a litany of charges and attendant specifications in relation to the murders. Brantley was found guilty at trial of all of the charged offenses and specifications. After the sentencing phase of the trial, Brantley was sentenced to life in prison without the possibility of parole on each of the four counts of aggravated murder. The trial court ordered those sentences to be served consecutively. Many of the other charges merged for the purposes

of sentencing. The trial court sentenced Brantley to three-year terms of incarceration on each of four firearm specifications. The trial court ordered the sentences on the firearm specifications to be served consecutively to each other and prior to the life sentences. This Court affirmed Brantley's convictions on direct appeal. *State v. Brantley*, 9th Dist. Summit No. 27466, 2016-Ohio-4680.

{¶3} In 2016, Brantley filed a petition for post-conviction relief. Brantley sought a new trial on the basis that the State had elicited false testimony from two witnesses, Anthony Townsend and Deonte Woods. Brantley argued that the State failed to disclose that it had entered into agreements with Townsend and Woods in exchange for their testimony, in violation of the constitutional due process standard articulated by the United States Supreme Court in *Brady v. Maryland*, 373 U.S. 83 (1963) and *Giglio v. U.S.*, 405 U.S. 150 (1972). The trial court entered judgment in favor of the State with respect to the portion of the petition pertaining to Mr. Woods on the basis that the conduct which gave rise to Mr. Woods' indictment did not occur until after he testified in Brantley's trial, meaning that no deal could have been in place at the time he testified.[1] As for Brantley's claims centering on Townsend's testimony, the matter proceeded to a two-day hearing. After the hearing, the trial court permitted additional briefing and accepted a large appendix of evidentiary material. The trial court issued a journal entry denying the petition on April 5, 2021.

{¶4} On appeal, Brantley raises two assignments of error.

---

[1] In reaching this determination, the trial court noted that Haywood's trial did not commence until after Brantley's trial had concluded.

II.

**ASSIGNMENT OF ERROR I**

THE LOWER COURT ABUSED ITS DISCRETION WHEN IT DID NOT APPLY THE APPROPRIATE STANDARD FOR MATERIALITY UNDER GIGLIO V. UNITED STATES, 405 U.S. 150 (1972). INSTEAD, THE COURT APPLIED A MORE STRINGENT STANDARD UNDER UNITED STATES V. BAGLEY, 473 U.S. 667 (1985).

**ASSIGNMENT OF ERROR II**

THE LOWER COURT ABUSED ITS DISCRETION WHEN IT FOUND THAT THE STATE'S WITHHOLDING OF ITS DEAL WITH A KEY WITNESS WAS NOT MATERIAL. UNDER GIGLIO, THE STATE'S ELICITATION OF FALSE TESTIMONY FROM A KEY WITNESS ABOUT THE DEAL FOR JUDICIAL RELEASE AFFECTED THE JUDGMENT OF THE JURY AND UNDERMINED ANY CONFIDENCE IN THE OUTCOME OF MR. BRANTLEY'S TRIAL.

{¶5} In his first assignment of error, Brantley contends that the trial court abused its discretion by failing to apply the appropriate materiality standard in resolving his petition. In his second assignment of error, Brantley contends that the trial court abused its discretion when it ultimately determined that he had failed to meet the materiality standard and denied his petition.

{¶6} A trial court's denial of a petition for post-conviction relief is reviewed for an abuse of discretion. *State v. Smith*, 9th Dist. Summit Nos. 29779, 29780, 2021-Ohio-1177, ¶ 8. An abuse of discretion is more than an error of law or judgment; it is a finding that the court's attitude is unreasonable, arbitrary or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶7} In *Brady*, 373 U.S. at 87, the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment[.]" "There are three components of a true *Brady* violation: [1] The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [2] that evidence must

have been suppressed by the State, either willfully or inadvertently, and [3] prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-282 (1999).

{¶8} The Supreme Court extended its holding in *Brady* when it decided *Giglio*, a case where the prosecution failed to disclose a promise that it had made to its main witness. *Giglio*, 405 U.S. at 150-151. The Assistant United States Attorney who presented the case to the grand jury promised the witness that he would not be prosecuted if he cooperated and agreed to testify. *Id*. at 152. Subsequently, on cross-examination at trial, the witness testified that he had not received any promises in exchange for his testimony. *Id*. at 151-152. The prosecution did not correct the false testimony. *Id*. Relying on *Napue v. Illinois*, 360 U.S. 264 (1959),[2] the *Giglio* court set forth the following materiality standard for determining whether a new trial was required under *Brady*:

> We do not[] [] automatically require a new trial whenever a combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict. A finding of materiality of the evidence is required under *Brady*[.] A new trial is required if the false testimony could * * * in any reasonable likelihood have affected the judgment of the jury[.]

*Id*. at 154 (Internal citations and quotations omitted). In concluding that a due process violation had occurred and that a new trial was warranted, the Supreme Court noted that the Government's case was "almost entirely" dependent on the witness's testimony and that "without it there could have been no indictment and no evidence to carry the case to the jury." *Id*.

---

[2] In *Napue*, the Supreme Court held that the defendant's due process rights were violated where the State failed to correct false testimony regarding whether the witness had received consideration in return for his cooperation, even when the false testimony related only to the credibility of the witness. *Id*. at 269, 272. The high court observed that "[t]he jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend." *Id*. at 269.

{¶9}   The *Brady* rule "arguably applies in three quite different situations." *United States v. Agurs*, 427 U.S. 97, 103 (1976).  The first situation, as exemplified by *Giglio*, is where the prosecution relied on false testimony and it either knew or should have known that the testimony was false. *Agurs* at 103.  In these cases, "a strict standard of materiality [is required], not just because they involve prosecutorial misconduct, but more importantly because they involve a corruption of the truth-seeking function of the trial process." *Id*. at 104.  Accordingly, the use of false testimony "must be set aside if there is any reasonable likelihood that the testimony could have affected the judgment of the jury." *Id*. at 103.   The second situation where the *Brady* rule is applicable is when the prosecution defies a pretrial request for specific evidence. *Id*. at 104.  The third situation is where the prosecution refuses to disclose evidence favorable to the accused when there is only a general request for exculpatory evidence or no request is made. *Id*. at 107.  With respect to the second and third situations, the evidence is considered material for the purposes of *Brady* "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985).  "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Id*.

Brantley's Post-Conviction Petition

{¶10}  Brantley's petition for post-conviction relief hinged on his claim that the State had elicited false testimony from Anthony Townsend regarding whether he received consideration from the State in exchange for his testimony.

{¶11}  On direct examination at Brantley's trial, Townsend gave the following testimony:

Q:    All right.  Have there been any promises or deals made to you in regards to anything that has happened with you and your situation, your legal situation?

A:    No, no.

Q:    As a matter of fact, you ended up getting sentenced to prison since that time, correct?

A:    Excuse me?

Q:    Since the time you actually --

A:    Oh, yeah, yeah.

Q:    -- sentenced to prison?

A:    Sentenced to prison, yes.

Q:    There was no deal for cooperation or anything in regards to this case in that other case correct?

A:    No. Actually, I just want to clear my name. With my peers, everyone thought I had something to do with it, people that I grew up with, years, kind of hurt me, you know.

{¶12} At the hearing on his petition, Brantley presented evidence showing that Townsend had in fact received consideration from the State. At the time he testified in Brantley's trial, Townsend was serving a prison sentence for trafficking in heroin. Before Townsend was sentenced in his trafficking case, his attorney approached the assistant prosecutor and indicated that Townsend had information on an ongoing homicide investigation. While there was no explicit promise of judicial release, the assistant prosecutor agreed to consider the possibility of judicial release if Townsend cooperated in the homicide investigation. The assistant prosecutor averred that he would not have agreed to consider judicial release if it were not for Townsend's cooperation. The assistant prosecutor further averred that he did not learn about which homicide investigation Townsend was referring to until approximately three years later. After Townsend testified against Brantley and then in a separate trial against Brantley's co-defendant, Deshanon Haywood, Townsend was granted judicial release.

{¶13} The State stipulated that "favorable evidence to [Brantley] was not disclosed to [the] defense[]" and that Brantley had satisfied the first two prongs of the Brady standard.[3] The State disputed that Brantley could satisfy the materiality prong of the *Brady* standard in regard to either his conviction or sentence. A written stipulation was entered into the record.

{¶14} Throughout the post-conviction proceeding, Brantley insisted that Townsend's testimony was material for *Brady* purposes because he was the only witness who placed Brantley and Haywood at the scene of the crime. Brantley called three witnesses and presented a large amount of evidence in support of this proposition.

{¶15} Brantley's first witness was the assistant prosecutor who tried Brantley's case on behalf of the State. The assistant prosecutor testified that he did not have personal knowledge of the prior discussions with Townsend regarding judicial release at the time of Brantley's trial. Although the assistant prosecutor drew a distinction between the State's willingness to consider judicial release in exchange for testimony and agreeing to recommend judicial release if the witness testifies on behalf of the State, the assistant prosecutor acknowledged that the State had an obligation to turn over evidence favorable to the defense.

{¶16} Brantley's second witness was the defense attorney who represented Haywood both at his initial trial and at his re-trial. Townsend's testimony at Haywood's first trial was similar to the testimony he had previously given at Brantley's trial. After the jury returned guilty verdicts in Haywood's first trial, but prior to sentencing, Haywood's attorney learned of some information that caused him to file a motion for a new trial. Specifically, Haywood's attorney

---

[3] In stipulating to the first two prongs of *Brady*, the State indicated that the conduct at issue was attributable to the former assistant prosecutor who handled Townsend's trafficking case, and thus should be imputed on the State, but that no other employees of the prosecutor's office were aware of the conduct at the time of Brantley's trial.

filed the motion upon learning that two witnesses, one of which was Townsend, had received consideration from the State in exchange for their testimony. While Haywood's attorney acknowledged that the motion for a new trial was also predicated on the testimony of Mr. Deonte Woods, Haywood's attorney opined that Townsend's testimony was more probative because it placed Haywood directly at the scene of the murders. The State agreed to a new trial. At the hearing, Haywood's attorney expressed his view that Townsend was one of the State's most important witnesses in building a case against Haywood. Haywood's attorney explained that at the re-trial, he was able to attack Townsend's credibility on the basis that he had provided false information on prior occasions and he had entered into an agreement with the State. Haywood's attorney did not have the opportunity to undertake this strategy during Haywood's initial trial. Haywood was convicted after his re-trial and the trial court imposed a total sentence of life imprisonment with parole eligibility after 35 years.

{¶17} Brantley's final witness was Ian Friedman, an attorney who was qualified as an expert in criminal defense. Attorney Friedman drew a distinction between introducing a witness's criminal record for impeachment purposes and introducing evidence that a witness had entered into a deal with the State in exchange for their testimony. Attorney Friedman suggested that evidence of an agreement with the State is a much more direct and impactful way to call the truthfulness of the witness's testimony into question. Attorney Friedman testified that Brantley's defense attorney could have used the agreement between Townsend and the State to attack Townsend's credibility. If the trial court granted Brantley a new trial, according to Attorney Friedman, it would be highly likely that defense counsel would introduce evidence that Townsend provided false testimony at a prior proceeding. Attorney Friedman suggested that the

fact that Brantley's attorney was deprived of that opportunity impacted the fairness of the process.

{¶18} The State attempted to call Brantley's trial counsel as a witness at the PCR hearing. Brantley objected to the testimony on the basis that he had not waived any of his rights with respect to either attorney-client privilege or attorney work product. During the course of this exchange, it became evident that Brantley's trial counsel had conversations with the State about testifying at the PCR hearing. Thereafter, Brantley filed a motion to disqualify the Summit County Prosecutor's Office based on its conduct involving Brantley's trial counsel. The trial court ultimately granted the motion to disqualify. Subsequently, the trial court granted a motion to appoint a special prosecutor to handle the matter going forward.

{¶19} In addition to the evidence presented at the hearing, the trial court considered multiple volumes of written materials in resolving the petition. On January 25, 2021, the trial court issued a journal entry denying Brantley's petition on the basis that he had not satisfied the materiality prong of the *Brady* standard.

<u>Townsend's Testimony at Brantley's Trial</u>

{¶20} Townsend gave the following testimony at Brantley's trial. In the early evening hours of April 17, 2013, Townsend drove to his friend Ronald Roberts' apartment located at 42 Kimlyn Circle in Akron for a social gathering. Townsend was friends with many people at the gathering because they had grown up in the same neighborhood. There was also a thread of heroin dealings within Townsend's friend group, but he was not aware of any drug transactions that occurred on that particular evening. Townsend congregated with several people in the kitchen. While there were people in other areas of the house, including the living room, Townsend did not make contact with them.

{¶21} During his testimony, Townsend noted that it was not uncommon for he and his friends to patronize night clubs. On one such occasion prior to the evening in question, Townsend went to Club Escape in Akron with Mr. Roberts and Kem Delaney. Townsend observed Mr. Roberts and Mr. Delaney engage in a conversation with Brantley and Haywood. Townsend was not aware of the subject matter of the conversation.

{¶22} On the evening of April 17, 2013, Townsend left the gathering at Mr. Roberts' apartment at approximately 9:00 p.m. and drove to a night club. After a brief stop, Townsend then drove to a second night club where he connected with a longtime friend, Keenan Williams. Townsend and Mr. Williams. engaged in conversation with Kiana Welch and Maria Nash, both of whom were employees at the establishment. Townsend knew Ms. Welch because she was dating Mr. Roberts and she resided with him at 42 Kimlyn Circle. At approximately midnight, Townsend, Mr. Williams, Ms. Welch, and Ms. Nash decided to go to Denny's for a meal. After finishing up at Denny's, the group drove to Ms. Nash's apartment and continued to socialize. Townsend testified that he and Ms. Welch proceeded to have an intimate encounter. Mr. Williams and Ms. Nash were also intimate at that time. Thereafter, Townsend agreed to drive Ms. Welch and Ms. Nash back to 42 Kimlyn Circle, where Ms. Welch resided. Although Ms. Nash was already at her apartment, she intended to stay with Ms. Welch that evening because they had plans the next day. Mr. Williams left separately.

{¶23} Townsend dropped off Ms. Welch and Ms. Nash at Kimlyn Circle at approximately 3:00 a.m. Townsend then drove home. After being at home for a short time, Townsend received a called from Ms. Welch, who asked him to come back because she could not get into the apartment. Townsend heard Ms. Welch say, "he ain't letting me in the house[.]" Townsend initially assumed that Mr. Roberts was not letting her in the house because he was

frustrated that she came home so late. Townsend testified that while he told Ms. Welch that he could come get her, he did not actually intend to do so because his girlfriend was very upset with him. After further reflecting on the situation, however, Townsend called Ms. Welch back to see if she could get inside. Ms. Welch responded that she was "cool[.]" Townsend assumed that she had been able to get inside.

{¶24} The State engaged in a line of questioning about the information that Ms. Welch conveyed to Townsend as she peered into the window of her apartment. Townsend indicated that Ms. Welch said, "I see him in the house running around, but he['s] act[ing] like he won't open the door." When pressed on whether she indicated to whom she was referring, Townsend testified that Ms. Welch said either "Doug or Dutch." While it would not have been unusual for Ms. Welch to mention Dutch, as that was Mr. Roberts' nickname, Townsend testified that his impression at the time was that she had said "Doug." "Doug" is a nickname for Deshanon Haywood, Brantley's co-defendant. The next morning, someone called Townsend and asked him what was going on with Mr. Roberts. It was at that time that Townsend learned that the apartment where Mr. Roberts and Ms. Welch lived had been taped off by police. Townsend drove to the scene. There he was informed that Mr. Roberts, Ms. Welch, Ms. Nash, and Mr. Delaney had been murdered. Townsend stated to a friend around that time that he thought Ms. Welch had referenced "Doug" the previous evening.

{¶25} On cross-examination, Brantley's lawyer inquired as to whether Welch ever referenced either "Derrick" or "Brantley" while she was looking into the window. Townsend responded in the negative. Townsend further testified Welch did not mention "Buck[,]" which is Brantley's nickname.

<u>Discussion</u>

{¶26} On appeal, Brantley argues that the trial court abused its discretion by applying the materiality standard set forth in *Bagley* as opposed to the more defense-friendly standard set forth in *Giglio*. Brantley maintains that applying the improper standard caused the trial court to reach an incorrect result with respect to its materiality analysis. In support of his underlying position, Brantley stresses that Townsend was the only witness to place Brantley and Haywood at the scene of the crime around the time the murders were committed. Although Townsend never testified that Ms. Welch mentioned Brantley while she was peering into her apartment, Brantley argues that mentioning Haywood was just as impactful given that the State's theory of the case was predicated on the notion that Brantley and Haywood were together that evening. Brantley further emphasizes that Townsend was the last witness to see Ms. Welch and Ms. Nash alive.

{¶27} A review of the record in this matter reveals that the testimony offered by Townsend regarding his whereabouts on the evening of the murders was consistent with information police obtained through phone records and surveillance videos. The State also presented evidence of cell tower logs that placed Brantley and Haywood near the Kimlyn Circle apartments on the evening of the murders.

{¶28} The State presented evidence that several of Townsend's friends attended the gathering hosted by Mr. Roberts on the evening of April 17, 2013, including Isaac Love and Kevin Cook. While Townsend testified that he was unaware of drugs exchanging hands that evening, Mr. Love and Mr. Cook testified that drug transactions did in fact take place. Mr. Love left a small amount of heroin for his friend Mr. Roberts prior to leaving the party.

**{¶29}** Cell phone records showed that Mr. Roberts' phone received a call from a phone registered to Haywood shortly after 1:00 a.m. on April 18, 2013. Not long after, a call was made from Haywood's phone to Deonte Woods. Mr. Woods was connected to Brantley and Haywood through both friendship as well as their involvement in the drug world.

**{¶30}** When Haywood called Mr. Woods, he asked Mr. Woods to follow him to an undisclosed location. Haywood did not explain why he needed Mr. Woods to follow him but Mr. Woods testified that such requests were not necessarily uncommon in their relationship. Haywood drove to Mr. Woods' residence in a black Kia. Brantley was a passenger in the vehicle. Mr. Woods then followed Haywood and Brantley in his red Kia to the Gurley Avenue area of Akron, which is close to the Kimlyn Circle apartments. When they arrived, Brantley and Haywood instructed Mr. Woods to park his vehicle. Haywood and Brantley then drove away. While he sat in his vehicle, Mr. Woods fell asleep. When Mr. Woods awoke, he attempted to call and text the two men but he was unable to reach them.

**{¶31}** The State presented phone records showing that Haywood received a text message at 2:10 a.m. that stated, "Kill both of these niggas." (Sic.) The text message was sent from a phone number associated with Brantley. Another text message from the phone number associated with Brantley was sent to Haywood at 2:48 a.m. that stated, "I'm bouta shoot Dutch go get da shit and then I'ma kill both des n******* but u got to hurry up so we can get up out of here[.]" (Sic.) Brantley eventually called Mr. Woods to check if he was still there and if there was anyone else in the area. Brantley and Haywood then jogged to Mr. Woods' vehicle and got in. Brantley was holding a white t-shirt and a small bag that looked to contain approximately half an ounce of drugs. Mr. Woods was aware that half an ounce of drugs could be worth a substantial sum of money. After Brantley and Haywood got into the vehicle, Mr. Woods heard

one of them say, "Take it to our grave." Mr. Woods did not know who made that statement but he clarified that one of them told him, "Take it to our grave or I'll kill you." Mr. Woods specifically heard Brantley say, "I doubled back to kill them." Although Mr. Woods was not exactly sure about what had transpired, he did not ask any questions. Instead, he transported Brantley and Haywood to Donte's Game Day bar and then went home. The following morning, Haywood texted Mr. Woods and asked if Mr. Woods had told his cousin about what happened. Mr. Woods responded in the negative.

{¶32} Isaac Love, who had attended the Kimlyn Circle gathering on the evening of April 17, 2013, testified that he placed a call to Mr. Roberts the following morning. An unfamiliar man answered the phone. When Mr. Love called the number a second time, a woman answered the phone. Mr. Love assumed that Ms. Welch had answered the phone. When Mr. Love asked to speak with Mr. Roberts, the woman indicated that he was not around. Mr. Love then inquired as to when Mr. Roberts would return. The woman responded that would never happen. Mr. Love and his wife then drove to the Kimlyn Circle apartments in an attempt to figure out what was going on. The door to Mr. Roberts' apartment was opened. Mr. Love entered and he ultimately discovered the bodies of Mr. Roberts, Ms. Welch, Mr. Delaney, and Ms. Nash in the basement. Mr. Love notified the police.

{¶33} Cell phone records played a large role in police coming to suspect Brantley and Haywood. Police did not find any cell phones in the basement of the Kimlyn Circle apartment. However, Mr. Roberts' phone was located in the middle of a street on April 18, 2013, and it was ultimately turned over to police. The last incoming call on Mr. Roberts' phone around the time of the incident was from a phone associated with Haywood. When police spoke with Haywood, they found that his phone had been reset to its factory setting. Police were able to obtain

information about Haywood's calls and texts through Verizon and it was at that time they learned that he had received two texts about killing people at approximately 2:00 a.m. on April 18, 2013. During a subsequent interview with Brantley, police learned that the texts were sent from a phone associated with him.

{¶34} The mother of Haywood's child, S.J., attempted to reach Haywood on multiple occasions during the early morning hours of April 18, 2013. S.J. also attempted to reach Brantley and Mr. Woods. Roughly a week after the incident, S.J. sent a text message to Brantley expressing concern that police had Mr. Roberts' phone, and that Brantley's number was in his phone. Several days later, S.J. sent another message to Brantley where she suggested that Brantley and Haywood needed to change their phone numbers. With the aid of a software program, police were able to figure out that Brantley deleted a text that he had sent to Haywood that referenced killing people. Police also learned that, on the afternoon of April 18, 2013, Haywood had sent Brantley a screenshot of a news article reporting on the murders.

{¶35} A careful review of the record reveals that the trial court did not abuse its discretion in denying Brantley's petition. This holds true regardless of whether the trial court applied the materiality standard set forth in *Giglio* or the materiality standard set forth in *Bagley*. Even under the more defense-friendly materiality standard set forth in *Giglio*, Brantley has not demonstrated that there is any reasonable likelihood that Townsend's false testimony affected the judgment of the jury with respect to either Brantley's underlying convictions or the sentence imposed. *See Giglio*, 405 U.S. at 154.

{¶36} While Brantley analogizes the facts of this case to *Giglio*, we note that Giglio involved a scenario where the prosecution's case hinged "almost entirely" on the testimony of the witness who gave false testimony about his deal with the prosecution. *Id*. at 154. By

contrast, the State's case here included an overwhelming amount of circumstantial evidence against Brantley that was independent from Townsend's testimony. The State's most compelling evidence against Brantley was not predicated on a finding by the jury that Townsend was credible. While Brantley argues that Townsend was the only witness to place Brantley and Haywood at the scene of the murders, the State presented evidence of cell tower logs that showed Brantley and Haywood were in the vicinity of the Kimlyn Circle apartments around the time of the murders. Mr. Woods testified that he followed Brantley and Haywood to a street in the vicinity of the Kimlyn Circle apartments, where he was ordered to wait. After he received a call from Brantley to make sure nobody was around, Brantley and Haywood returned to Mr. Woods' vehicle. When Brantley and Haywood entered the vehicle, Mr. Woods heard Brantley say that he "doubled back to kill them." One of the men threatened Mr. Woods by saying, "Take it to our grave or I'll kill you." The State further presented evidence that Brantley sent Haywood two texts that discussed killing people that evening, including one that referenced shooting "Dutch[.]" Under these circumstances, Brantley has not demonstrated that there is any reasonable likelihood that Townsend's false testimony affected the judgment of the jury with respect to either his convictions or sentence. Accordingly, we cannot say that the trial court's denial of Brantley's petition constituted an abuse of discretion.

{¶37} Mr. Brantley's assignments of error are overruled.

III.

{¶38} Brantley's assignments of error are overruled. The judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

_____

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

_____
DONNA J. CARR
FOR THE COURT

TEODOSIO, J.
SUTTON, J.
CONCUR.


APPEARANCES:

JOHN Q. LEWIS, JONATHAN F. FECZKO, JON W. OEBKER, RACHEL N. BYRNES, and EMILY J. JOHNSON, Attorneys at Law, for Appellant.

KEVIN J. BAXTER, Prosecuting Attorney, and KRISTIN R. PALMER, Assistant Prosecuting Attorney, for Appellee.